Filed 12/3/20

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>JOSEPH ANGEL ABBATE,<br><br>        Defendant and Appellant. | A152421<br><br>(Contra Costa County<br>Super. Ct. No. 51319516) |

A jury found defendant Joseph Angel Abbate guilty of second-degree murder (Pen. Code, § 187[1]), conspiracy to commit a felony by active street gang participants (§ 182.5), and being a felon in possession of a firearm (§ 29800, subd. (a)(1)).  On appeal, defendant argues:  (1) the trial court erred by admitting evidence of a prior murder under Evidence Code section 1101, subdivision (b); (2) section 182.5, which criminalizes participation in a criminal street gang conspiracy, is void for vagueness and violates the principle of personal guilt; (3) Senate Bill No. 620 requires a remand to allow the court to exercise its sentencing discretion; and (4) Senate Bill No. 1437 requires reversal of his murder conviction.

---

\*       Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A, C, and D of the Discussion.

[1]       All further statutory references are to the Penal Code unless otherwise specified.

In the published portion of this opinion, we reject defendant's challenges to section 182.5. In the unpublished portion, we conclude defendant's contentions regarding the prior murder evidence and Senate Bill No. 1437 are without merit but determine a remand is necessary in light of Senate Bill No. 620.

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged defendant, Steven Cruz, and Ricardo Ochoa with the murder of Eduardo Ochoa (§ 187, count 1).[2] The People alleged firearm enhancements (§ 12022.53, subds. (b)–(e)(1)) as to each defendant, and also alleged they committed the murder for the benefit of, at the direction of, and in association with a criminal street gang, namely, "Da Bay's Grimiest" also known as "DBG" (§ 186.22, subd. (b)(1)). The People additionally charged defendant and his co-defendants with conspiracy to commit a felony by active street gang participants (§ 182.5, count 2), and charged defendant alone with being a felon in possession of a firearm (§ 29800, subd. (a)(1), count 3). As to the firearm possession count, the People alleged defendant committed the crime for the benefit of, at the direction of, and in association with DBG (§ 186.22, subd. (b)(1)).

Defendant's first trial took place in 2014. Ultimately, the jury could not reach a verdict on the murder charge, resulting in a mistrial on that charge. Moreover, while the jury found defendant guilty of the remaining counts and found true the gang enhancement (§ 186.22, subd. (b)(1)) accompanying the firearm possession count, the court granted defendant's motion for new trial as to the gang conspiracy count (§ 182.5). In sum, after

---

[2]     For the sake of brevity, parity, and clarity because of shared last names, we will generally refer to defendant, his co-defendants, and to the murder victim by their first names only. No disrespect is intended.

2

the first trial defendant stood convicted of the section 29800 count with the attendant gang enhancement.

A second trial took place in 2016. The jury found defendant guilty of second-degree murder and found true the attendant gang enhancement (§ 186.22, subd. (b)(1)) and firearm enhancement (§ 12022.53, subds. (d), (e)(1)). The jury also found defendant guilty of the section 182.5 gang conspiracy count. The court sentenced defendant to a term of 15 years to life in prison for the murder count, plus a consecutive 25 years to life term for the attendant firearm enhancement. The court also sentenced defendant to a term of 15 years to life for the gang conspiracy count, but stayed its execution pursuant to section 654. Finally, the court sentenced defendant to a consecutive two-year term for the firearm possession count, plus three years for the attendant gang enhancement.

The following summary of the evidence at the second trial is not comprehensive but provides the necessary background and context to the issues raised on appeal.

In 2010, a child was shot through the front door of a house in Contra Costa County. That address belonged to defendant, and the minor victim (who survived) is related to both defendant and co-defendant Steven, who is defendant's cousin. Defendant was at the house at the time of this shooting.

On April 11, 2012, around 12:30 p.m., B.O. was at home in San Pablo with her son, Eduardo.[3] Eduardo was affiliated with the "Norteno" street gang. B.O. heard a loud noise, like a "boom." Looking out of a window, she saw a small white car, like a Honda or a Toyota, "full of kids" looking at her

---

[3]     Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in Opinions," we refer to certain witnesses by first name and last initial or by initials only.

house before driving away. She found Eduardo bleeding with a large wound in his chest, and he died in her arms. During their investigation, the police located one expended cartridge case near the sidewalk in front of the home and, during the autopsy, recovered a bullet from the victim's chest. B.O. identified co-defendant Ricardo in a photo line-up as one of the people associated with the white car.[4]

Brian G. was the prosecution's principal witness.[5] Brian G., who was in his early twenties at the time of trial, testified he was a member of a gang called "Varrio Frontera Locos" or "VFL" in his early teens and a member of the DBG "tagging crew," but by his mid-teens he was not in or associated with any gang. Brian G. had known defendant since middle school.

The night before Eduardo's murder, Brian G. went to a party at the home of defendant's aunt in Richmond, where he hung out with defendant (also known as "Grams"), Ricardo (also known as "Rebz"), and Steven. Brian G., Ricardo, Steven, defendant, and some women ended up going to a hotel around the border of Richmond and El Cerrito in a white Toyota belonging to Brian G.'s then-girlfriend. They left the hotel the next day at around 10:00 a.m. Ricardo drove the men around in the white car, and they eventually went back to the home of defendant's aunt. There the men left Brian G. alone in the living room for 10 to 15 minutes before they left again,

---

[4]     On the stand, B.O. also identified defendant as the driver of the white car. After she testified, the parties read a stipulation into the record that B.O. did not identify defendant as a person she saw on the day of the shooting when she testified at the first trial. Later testimony also showed B.O. did not identify defendant in photo lineups the police showed to her.

[5]     Brian G. was charged in connection with Eduardo's murder, and he testified in exchange for a plea agreement which entailed a two-year prison sentence with the ability to earn half-time credits. After taking the plea, he was placed into a witness protection program.

purportedly to buy alcohol and get money at Ricardo's sister's house. Ricardo said he wanted to drive, and Steven "called shotgun." Brian G. sat behind the driver and next to defendant.

The men stopped at a liquor store, then drove by a house where defendant loudly said, "That's him" and " 'That's E.' " When defendant said this, the only person Brian G. could see was a male Hispanic who looked like he just stepped out of a house. After defendant said this, Ricardo—without prompting—stopped the car. Brian G. heard someone say, " 'He's a Dub boy,' " then, within seconds, Steven exited the car, walked within four to five feet of the male, and started "banging on" him by aggressively asking him if he was a "Dub boy." The male looked afraid and denied being a "Dub boy." After about a minute, Steven pulled out a gun and pointed it at the male, then Ricardo said, "Shoot that [racial slur]," and Steven shot him once in the chest. At this point the male ran back into the house, and Steven got back into the car. Ricardo drove them in a loop through Concord, before returning to Richmond.

Brian G. testified that defendant did not show any surprise or disapproval at what Ricardo said, nor surprise at Steven pulling a gun on the man, nor upset that Steven shot him. And during the drive afterward, defendant, Steven, and Ricardo appeared to be happy, listening to music and dancing like they "made a score." Brian G. acknowledged that during an early videotaped police interview, he told the police that after the shooting the other man in the back seat—i.e., defendant—said something like, "What the F is going on." When asked what he meant by this, and if this was an expression of surprise, Brian G. explained defendant was "like happy, shocked. You know, like he's the one that pointed him out."

5

Brian G. testified that during the drive he asked the others why the victim was killed.  Defendant responded that the victim had sent someone to kill him but the person mistakenly shot his niece in the face "through the window or something."[6]  Brian G. also testified that when Steven seemed bothered after the shooting, defendant told Steven not to worry, and the "first time" he would get paranoid, but it would be okay.  Defendant then talked about his own "first time" killing someone.  Defendant said he was on the streets looking for "suckas" (meaning rival gang members), found someone on Dunn Avenue in Richmond, jumped out and said " 'DBG,' " then started shooting and the victim who got shot started screaming " 'Darkie.' "

Brian G. also testified that, during the drive, defendant took a phone call and told the person on the phone that Steven " 'got his feet wet.' "  Phone records showed that about 20 minutes after the shooting, defendant's phone sent someone a text message stating, "Watch out for them suckas.  It's hot."  According to the prosecution's gang expert, this was an alert to other gang members that a violent act was committed and to be on alert for retaliation from rivals.

The day after the shooting, Brian G.—who was still hanging out with defendant—drove under the influence of alcohol, got into a car accident, left the white car at the scene, and got a ride back to his then-girlfriend's house.  Brian G. testified this was the last time he had contact with defendant.

Several weeks later, the police arrested Brian G. for drunk driving and for a hit-and-run and talked to him about the shooting.  Brian G. told the police numerous untrue stories before telling them that he was present

---

[6]     Sergeant Daniel Wiegers of the San Pablo Police Department, who was a lead investigator in Eduardo's murder case, testified that Brian G. told him that Steven, not defendant, had explained he shot the victim because the victim was responsible for shooting his niece.

during the shooting, that Steven was the shooter, and that Ricardo was the driver. Even after this, however, he remained too scared to identify defendant. The day after his arrest, Brian G. finally identified defendant as the fourth person involved in the shooting by writing defendant's name on a piece of paper. The officer who took the identification testified that Brian G. was too scared to say defendant's name out loud and continued to refuse to do so even after making the identification.

The other evidence at trial included evidence that defendant, accompanied by Steven, sold a gun after Eduardo's murder that was later recovered and determined to be the murder weapon. There was evidence that while dusting for fingerprints in the white car the men had ridden in, the police found the letters "DBG" written, as if with a finger, on the inside of the windshield on the passenger side of the car, and the inside of the rear right passenger side window. Records for a cell phone number associated with defendant and police officer witnesses generally corroborated Brian G.'s testimony about the men's location around the time of the shooting.

The prosecution's gang expert provided details about DBG, including that it had a "serious" rivalry—meaning encounters would lead to assault or assault with a firearm on sight—with a subgroup of the Nortenos called the "Dub Boyz." The expert testified, among other things, that defendant, Ricardo, and Steven were DBG members, and answered a hypothetical indicating defendant was a DBG leader. The expert opined that a subordinate who is "getting his feet wet" would not shoot someone in front of a gang leader without that leader's approval. A former DBG member testified that defendant was a DBG leader, and that defendant represented he founded the gang with a cousin.

The defense presented various witnesses to challenge the strength of the prosecution's case. In light of Brian G.'s testimony that he, defendant, Ricardo, and Steven drank alcohol and smoked marijuana the night before and the day of the shooting, and he was not completely sober throughout those days, the defense presented expert testimony on the impact of drugs and alcohol on human memory. During closing argument, defense counsel argued at length that Brian G. lied about defendant's involvement in Eduardo's shooting in order to get a plea deal. Defense counsel also tried to show weaknesses in the testimony of various prosecution witnesses.

## DISCUSSION

### A. Evidence Code Section 1101, Subdivision (b)

Defendant first contends the trial court erred in admitting evidence of a prior uncharged murder under Evidence Code section 1101, subdivision (b) ("section 1101(b)"). We find no abuse of discretion.

#### 1. Additional Facts

Before the second trial, the prosecutor moved to introduce evidence that defendant committed a prior uncharged murder. (Evid. Code, § 1101(b).) The trial court granted the motion, finding it relevant to prove specific intent for the murder count, as well as the knowledge and specific intent for the section 182.5 count.

As indicated above, Brian G. testified that when Steven seemed bothered about what he had done, defendant talked about his own "first time" killing someone, saying he was on the streets looking for rival gang members, found someone on Dunn Avenue in Richmond, jumped out and said " 'DBG,' " then started shooting and the victim he shot started screaming " 'Darkie.' " Additionally, the prosecution presented testimony from Wilfredo N. concerning the 2011 murder of Andrew Manriquez.

8

More specifically, Wilfredo N. testified that in April 2011, he was with Manriquez visiting a person known as "Darkie" at his home on "Dunn Street" in Richmond. It was almost 10:00 p.m. when Wilfredo N. was walking to his car and saw two people approach the house. Wilfredo N. saw one of them start shooting, but based on gun shot casings knew there was more than one shooter. He described them as Hispanic males in their early 20s. Manriquez was shot in the head and died. On the night of the shooting, Wilfredo N. told the police he could not identify anyone. About two weeks later, however, Wilfredo N. identified defendant in a photo-lineup as one of the men involved, but told the officer he was only 70 percent sure and did not want to send the wrong person to prison. Wilfredo N. testified more than 10 people told him someone named "Grams" may have been involved in the shooting.

The trial court instructed the jury it could find defendant guilty of murder under the following four theories aside from direct perpetration: (1) defendant aided and abetted the perpetrator in the murder; (2) he aided and abetted the commission of an assault with a firearm, the natural and probable consequence of which was murder; (3) he conspired to murder; or (4) he conspired to commit an assault with a firearm, the natural and probable consequence of which was murder. The court also instructed that if the People proved by a preponderance of the evidence that defendant committed the uncharged Manriquez murder, the jury could, but was not required to, consider that in deciding: (1) whether defendant acted with intent to murder Eduardo as charged in count 1; (2) whether a criminal street gang called DBG existed before Eduardo's killing as required for count 2; (3) whether murder and/or assault with a firearm were primary activities of DBG before Eduardo's killing as required for count 2; and (4) whether DBG engaged in a pattern of criminal gang activity before Eduardo's killing as

required for count 2.  The jury was instructed it could not conclude from the evidence about the Manriquez murder that defendant has a bad character or is disposed to commit crime.

### 2. *Analysis*

Evidence Code section 1101(b) permits the admission of evidence that a person committed an uncharged crime when relevant to prove some fact other than the defendant's propensity to commit such an act, such as intent. "Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2 (*Ewoldt*).)  "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.  [Citation.]  '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .'  [Citation.]  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' "  (*Id.* at p. 402.)  We review rulings on the admission of evidence under Evidence Code sections 1101(b) and 352 for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.)

Defendant first contends the evidence concerning the Manriquez murder (both Brian G.'s testimony and Wilfredo N.'s testimony) should have been excluded because that murder was insufficiently similar to the charged murder to be admissible under Evidence Code section 1101(b), as proof that

10

defendant intended to aid and abet, or intended to conspire to commit, the charged murder. We see no abuse of discretion.

Here, the evidence reflects that both shootings involved targets selected because of their association with, or perceived association with, rival gangs. With regard to the Manriquez shooting, the evidence showed that defendant and a cohort perpetrated that shooting while on the streets looking for rival gang members, and that defendant shouted "DBG" before shooting. As for Eduardo's shooting, the evidence showed that after defendant identified Eduardo, Steven started "banging on" Eduardo by aggressively asking him if he was a "Dub boy."

Additionally, both shootings were "walk-up" shootings in the Richmond/San Pablo area. As the prosecution's gang expert explained, in the context of street gangs, "walk-up" shootings are considered more "difficult" and "prestigious" than "drive by" shootings.

The evidence that defendant was previously involved in a walk-up shooting targeting a rival gang member logically tended to support the inference that when defendant sat in the white car with Brian G., Ricardo, and Steven and identified the victim on the street, he did so with intent to aid and abet the victim's murder or an assault with a firearm, or he conspired to commit those crimes. The evidence was thus highly probative of intent and tended to negate an innocent mental state. (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) In reaching this conclusion, we note that "exact overlap" between the charged crime and uncharged prior act is not required. (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1193, fn. 4; see, e.g., *People v. Jones* (2011) 51 Cal.4th 346, 371 [evidence of a prior robbery that was not particularly similar to the charged home invasion properly admitted because the two crimes involved "one crucial point of similarity—the intent to steal from victims

11

whom defendant selected"]; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1043, 1058–1060 [evidence of defendant's prior violent acts towards gang rivals at mall "relatively similar" to her acting as a getaway driver to assist in an indiscriminate shooting at a gang rival's memorial wake].)

Next, defendant argues the evidence of the uncharged murder should have been excluded as irrelevant to any disputed issue in the case. Relying on *People v. Balcom* (1994) 7 Cal.4th 414 (*Balcom*), defendant contends that, regardless of any similarity to a charged crime, uncharged acts may not be admitted to prove intent where—if the jury believes the prosecutor's theory of events—it must necessarily believe that the defendant acted with the requisite intent. This argument lacks merit.

*Balcom* was a rape case where the victim testified the defendant raped her at gunpoint, while defendant claimed they had consensual intercourse. (*Balcom*, *supra*, 7 Cal.4th at pp. 418–420.) The prosecution presented evidence that defendant raped another woman at gunpoint six weeks after the charged offense. (*Id.* at p. 421.) The Supreme Court concluded the trial court improperly admitted the evidence because its "limited probative value" to prove intent was outweighed by its "substantial prejudicial effect." (*Id.* at p. 423.) There, the victim and the defendant had presented "wholly divergent accounts"; thus, if the jury believed the victim's account that defendant forced her to have sex at gunpoint, then "[n]o reasonable juror . . . could have concluded that defendant . . . lacked the requisite intent to commit rape" and the evidence of the uncharged rape would have been "merely cumulative on this issue." (*Id.* at pp. 422–423.)

Unlike the situation in *Balcom*, defendant did not testify, and the jury was not faced with "wholly divergent accounts" of how Eduardo's shooting occurred. As defendant observes, Brian G. testified that defendant was

12

happy about Steven shooting Eduardo, that defendant explained the shooting was to avenge his niece, and that defendant bragged about the Manriquez shooting. Although this evidence and other circumstances surrounding the Eduardo shooting tended to show intent, a reasonable jury could have believed that defendant lacked intent to kill. (*Balcom*, *supra*, 7 Cal.4th at p. 422.) Indeed, because defendant was not the actual shooter, and he and Steven share the same niece who was previously shot, a reasonable juror could have interpreted the evidence as showing merely that defendant identified Eduardo on the street with no concurrent criminal intent, and that defendant was simply happy when Steven took matters into his own hands. Thus, in contrast to the circumstances in *Balcom*, the evidence of the uncharged gang-related Manriquez shooting, including defendant's bragging about it, provided compelling evidence of defendant's intent under similar circumstances and would not have been "merely cumulative." (*Id.* at p. 423.)

Finally, defendant claims evidence of the uncharged murder should have been excluded under Evidence Code section 352 given its highly prejudicial nature. Again, we disagree.

Evidence of uncharged offenses must have substantial probative value to be admissible, given the substantial prejudicial effect inherent in such evidence. (*People v. Rogers* (2013) 57 Cal.4th 296, 331.) Here, defendant's intent, an element of the charged murder, was at issue and contested. (*People v. Daniels* (1991) 52 Cal.3d 815, 857–858.) The evidence of the Manriquez murder had substantial probative value with respect to establishing defendant's intent to kill at the time of the shooting (*Ewoldt*, *supra*, 7 Cal.4th at p. 404), and it was no more inflammatory than the charged murder (*People v. Lindberg* (2008) 45 Cal.4th 1, 25). Furthermore, the trial court gave a limiting instruction advising jurors they could not

13

conclude from the evidence that defendant has a bad character or is disposed to commit crime. This instruction, which we presume the jury followed, mitigated the possibility of prejudice. (*Id.* at pp. 25–26.)

In sum, the evidence of the Manriquez murder was properly admitted.

**B. Challenges to Section 182.5**

Section 182.5 provides: "any person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182."[7] This statute created a new form of conspiracy distinct from the traditional understanding of the crime and was intended to " 'expand[] the law on conspiracy to include gang-related activities.' " (*People v. Johnson* (2013) 57 Cal.4th 250, 261, italics omitted.)

Defendant challenges section 182 on constitutional grounds, arguing the statute is void for vagueness. He additionally argues the statute impermissibly punishes persons based on mere affiliation with an organization without the requisite "personal guilt" described in *Scales v.*

---

[7] "Criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [various enumerated crimes], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

"Pattern of criminal gang activity" is defined, in part, as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [various enumerated] offenses." (§ 186.22, subd. (e).)

*United States* (1961) 367 U.S. 203 (*Scales*). We address these claims in turn below.

### 1. Vagueness

Defendant first contends the portion of the statute that punishes those who "willfully . . . benefit[] from any felonious criminal conduct by [gang] members" is void for vagueness on its face in violation of state and federal due process provisions. (§ 182.5.) More specifically, he claims the statute does not make clear "whether the defendant must have knowledge that the benefit he willingly and purposely received actually came from" felonious gang conduct. As an example, he asserts it is unclear if a defendant receiving stolen money from a gang member who robbed a bank could be liable "even if he had no knowledge of the bank robbery." He also argues the statute does not make clear "whether the defendant needs to agree to or even know about the benefit he will receive before or during the commission of the underlying felony."

Defendant further contends the statute is void for vagueness as applied. Similar to his facial challenge, he claims ordinary persons of common intelligence cannot understand the meaning of the statutory phrase " 'who willfully . . . benefits.' " We reject these contentions.

"The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of 'life, liberty, or property without due process of law,' as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7)." (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567 (*Williams*).) To satisfy the dictates of due process, a criminal statute must satisfy two requirements. "First, the provision must be definite enough to provide a standard of conduct for those whose activities are proscribed. . . . [¶] Second, the statute must

provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement." (*People v. Heitzman* (1994) 9 Cal.4th 189, 199–200; *Holder v. Humanitarian Law Project* (2010) 561 U.S. 1, 18 (*Holder*).)

"The starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." ' " (*Williams*, *supra*, 5 Cal.4th at p. 568.) Moreover, it is settled that one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." (*Village of Hoffman Est. v. Flipside, Hoffman Est.* (1982) 455 U.S. 489, 494–495 (*Hoffman Estates*); *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1095.) We review the constitutionality of statutes de novo. (*People v. Superior Court (J.C. Penney Corp., Inc.)* (2019) 34 Cal.App.5th 376, 387 (*J.C. Penney Corp., Inc.*).)

Defendant acknowledges the rule that a defendant who engages in conduct clearly proscribed by a law cannot complain of the law's vagueness as applied to the conduct of others. (*Hoffman Estates*, *supra*, 455 U.S. at p. 495.) He also does not question the attendant rule that courts should first conduct an as-applied inquiry before addressing a facial vagueness challenge. (*Ibid.*; see *J.C. Penney Corp., Inc.*, *supra*, 34 Cal.App.5th at pp. 400, 403–404 [observing *Johnson v. United States* (2015) 576 U.S. 591 "did not put an end to the 'as-applied inquiry first' rule"], and cases cited therein; *Kashem v. Barr* (9th Cir. 2019) 941 F.3d 358, 376–377.) We thus proceed by first examining whether section 182.5 clearly proscribes defendant's conduct. We conclude it does.

The language of section 182.5 makes clear it punishes "an active gang participant with knowledge of other members' pattern of criminal gang activity." (*People v. Johnson*, *supra*, 57 Cal.4th at p. 262.) It "does not require any prior agreement among the conspirators to promote, further, or assist in the commission of a particular target crime." (*Ibid.*) Moreover, it "brings within its ambit not only a gang member who promotes, furthers, or assists in the commission of a felony" but also "an active and knowing participant [in a criminal street gang] who merely *benefits* from the crime's commission, even if he or she did not promote, further, or assist in the commission of that particular substantive offense." (*Ibid.*) The statute requires that a defendant "willfully" promote, further, assist, or benefit from felonious gang conduct (§ 182.5), and case law has long recognized that " '[t]o do a thing wilfully is to do it by design, with set purpose.' [Citation.] To do a thing wilfully is to do it knowingly." (*People v. Calvert* (1928) 93 Cal.App. 568, 573; see *People v. Atkins* (2001) 25 Cal.4th 76, 85.)

Here, there was evidence that defendant was a DBG leader who actively participated in the gang, that he knew DBG members engaged in a pattern of criminal activity, and that he acted as an aider and abettor or a conspirator in the Eduardo murder or in an assault with a firearm for which murder was a natural and probable consequence. Indeed, the jury convicted defendant of murder and found true the allegation that defendant committed the murder for the benefit of, or at the direction of, or in association with DBG, with specific intent to promote, further, or assist in criminal gang conduct. Because defendant's conduct fell squarely within the parameters of section 182.5, his vagueness challenge must fail. (*Holder*, *supra*, 561 U.S. at p. 21; *Bowland v. Mun. Court for Santa Cruz County Judicial Dist.* (1976) 18 Cal.3d 479, 492.)

17

In arguing to the contrary, defendant barely addresses his own conduct or the evidence presented in his case. Instead, he points out that *during the first jury trial*, the trial court indicated its belief that section 182.5 did not apply to a person who did not know about the crime he or she derived a benefit from, and the prosecutor made arguments leading the jury to believe it could convict defendant of the section 182.5 count without finding he agreed to benefit from or knew about the murder prior to its commission. Defendant also complains the trial court failed to instruct the jury in the second trial that it was required to find defendant willfully agreed to benefit from the murder prior to its commission.

These arguments are non-sequiturs. It is not apparent why statements by the trial court and prosecutor *at the first trial* and the claimed instructional omission in the second trial are relevant to the question of whether defendant's conduct clearly falls within the ambit of section 182.5. That said, we note the prosecutor did not suggest at the second trial that defendant was guilty under section 182.5 as a passive recipient of benefit. Moreover, the court instructed the jury a conviction on the section 182.5 count required its finding that defendant "acted with the specific intent to promote, further, assist, or benefit from the Second Degree Murder charged in Count One."[8]

Defendant asserts: "nothing in the jury's verdict indicates that it found that [defendant] planned a murder. Although the jury convicted [defendant] of murder in count one, the instructions permitted a conviction if the jury found [defendant] merely aided and abetted, or conspired to, commit an assault with a firearm and murder was a natural and probable consequence

---

[8] The issue of whether the trial court properly gave this specific intent instruction has not been briefed and that issue is not before us.

18

of that murder. [Citation.] Moreover, the evidence supported this theory." This argument is difficult to understand and ultimately unpersuasive. Again, the issue at hand concerns the constitutionality of section 182.5, and the precise question is whether defendant's conduct clearly fell within its bounds. As explained above, the answer to that question is a firm yes.

Bearing in mind the strong presumption that a law must be upheld unless its unconstitutionality "clearly, positively, and unmistakably appears" (*Williams*, *supra*, 5 Cal.4th at p. 568), we reject defendant's vagueness challenge to section 182.5.

### 2. *Personal Guilt and the* Scales *Decision*

Citing *Scales*, *supra*, 367 U.S. 203, defendant argues section 182.5 lacks its "element of personal guilt insofar as there is no requirement of a guilty knowledge and intent" and permits a conviction based on mere affiliation with an organization. We are not persuaded.

*Scales* involved an alleged member of the Communist Party of the United States who was convicted under the "membership clause" of the Smith Act, a federal law that criminalized "the acquisition or holding of knowing membership in any organization which advocates the overthrow of the Government of the United States by force or violence." (*Scales*, *supra*, 367 U.S. at p. 205.) Per the jury instructions, that crime required findings on two elements: "(1) the Communist Party advocated the violent overthrow of the Government, in the sense of present 'advocacy of action' to accomplish that end as soon as circumstances were propitious; and (2) [the defendant] was an 'active' member of the Party, and not merely 'a nominal, passive, inactive or purely technical' member, with knowledge of the Party's illegal advocacy and a specific intent to bring about violent overthrow 'as speedily as circumstances would permit.'" (*Id.* at p. 220.)

19

As relevant here, the petitioner in *Scales* challenged his conviction by arguing the law was unconstitutional on its face and as applied because it "impermissibly imputes guilt to an individual merely on the basis of his associations and sympathies, rather than because of some concrete personal involvement in criminal conduct" in violation of the Fifth Amendment. (*Scales*, *supra*, 367 U.S. at p. 220.) The United States Supreme Court rejected this contention and upheld the law. (*Id.* at pp. 224–228.) As the high court explained: "In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity (here advocacy of violent overthrow), *that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment.* Membership, without more, in an organization engaged in illegal advocacy . . . has not heretofore been recognized by this Court to be such a relationship." (*Id.* at pp. 224–225, italics added.)

The Supreme Court proceeded to analyze "the relationship between the fact of membership and the underlying substantive illegal conduct, in order to determine whether that relationship is indeed too tenuous to permit its use as the basis of criminal liability." (*Scales*, *supra*, 367 U.S. at p. 227.) On the record before it, the high court observed the Communist Party was "an organization which engages in criminal activity," and the court could "perceive no reason why *one who actively and knowingly works in the ranks of that organization, intending to contribute to the success of those specifically illegal activities*, should be any more immune from prosecution than he to whom the organization has assigned the task of carrying out the substantive criminal act." (*Id.* at pp. 226–227, italics added.) In upholding the validity of

20

the statute, the court reasoned that it reached "only 'active' members having also a guilty knowledge and intent, . . . which therefore prevents a conviction on what otherwise might be regarded as merely an expression of sympathy with the alleged criminal enterprise, unaccompanied by any significant action in its support or any commitment to undertake such action." (*Id.* at p. 228.)

The California Supreme Court's decision in *People v. Castenada* (2000) 23 Cal.4th 743 (*Castenada*) provides guidance in understanding *Scales*'s articulation of the requirement of personal guilt. *Castenada* addressed the applicability of *Scales* in the context of section 186.22, subdivision (a) ("186.22(a)"), another statute that criminalizes gang activity. (23 Cal.4th at p. 749.) Section 186.22(a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by" imprisonment.

Focusing on *Scales*'s holding that "the Smith Act satisfied the due process requirement of personal guilt by requiring proof of a defendant's active membership in a subversive organization with knowledge of and an intent to further its goals," the *Castenada* court indicated that *Scales* "allowed the criminal conviction of anyone holding active membership in a subversive organization, without requiring that the member aid and abet any particular criminal offense committed by other members." (*Castenada, supra*, 23 Cal.4th at pp. 749–750.) Then, turning to the statutory elements of section 186.22(a)—i.e., active participation in a criminal street gang, "knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity," and willful promotion, furthering, or assisting felonious gang conduct—*Castenada* observed that such elements *exceeded* the

21

active membership test articulated in *Scales* because "a person who violates section 186.22(a) has also aided and abetted a separate felony offense committed by gang members." (*Castenada*, at p. 749; see also *People v. Carr* (2010) 190 Cal.App.4th 475, 488, fn. 13 (*Carr*) [construing section 186.22's phrase " 'the defendant knew that members of a gang engaged in or have engaged in a pattern of criminal gang activity' . . . to correlate to the active membership test described in *Scales*, that is, ' "guilty knowledge and intent' of the organization's criminal purposes' "].)

Turning to the case at hand, we reject defendant's argument that section 182.5 violates the due process principles in *Scales*. Section 182.5, like section 186.22(a), requires a defendant's active participation in a criminal street gang, as well as "knowledge that its members engage in or have engaged in a pattern of criminal gang activity." Per *Castenada*, and as stated in *Carr*, this appears sufficient to satisfy *Scales*'s "active membership test." (*Carr*, *supra*, 190 Cal.App.4th at p. 488, fn. 13.)

Notwithstanding the foregoing, defendant focuses on the "benefit" provision in section 182.5 and argues it violates *Scales* because it punishes a defendant for willingly benefiting "without knowledge that the benefit received came as a result of criminal gang conduct." But, as previously mentioned, " '[t]o do a thing wilfully is to do it knowingly." (*People v. Calvert*, *supra*, 93 Cal.App.at p. 573; see *People v. Atkins*, *supra*, 25 Cal.4th at p. 85.) Defendant fails to explain how a person can "willfully . . . benefit[] from . . . felonious criminal conduct by members of [a] gang" without knowing the benefit he or she reaped came from felonious gang conduct. That is, if a jury finds that a defendant *willfully* benefited from felonious gang conduct, it stands to reason that the defendant impliedly knew that he or she reaped a benefit from that conduct. Thus, the premise of defendant's argument fails.

22

Furthermore, while it is true the statute in *Scales* "prohibited membership in a group advocating the violent overthrow of the government," i.e., it criminalized "mere membership" (*Holder*, *supra*, 561 U.S. at pp. 17–18), *Scales* "construed the statute to require *active* membership and, as so construed, *upheld it despite the absence of any element requiring a specific act of criminality*." (*People v. Albillar* (2010) 51 Cal.4th 47, 57, italics added.) Here, section 182.5 is not a statute that criminalizes mere membership in a gang or, as *Scales* put it, punishes "merely an expression of sympathy with the alleged criminal enterprise, unaccompanied by any significant action." (*Scales*, *supra*, 367 U.S. at p. 228.) Rather, section 182.5 makes a defendant culpable for conspiracy to commit a specific felony if, among other things, a defendant willfully benefits from felonious gang conduct. In other words, section 182.5 requires a significant action, not mere membership. (Cf. *United States v. Cupa-Guillen* (9th Cir. 1994) 34 F.3d 860, 863 ["Where an offense is based on an underlying act which society has an interest in preventing, the offense is not a status crime."].)

We reject defendant's claim that section 182.5 violates the concept of personal guilt articulated in *Scales*.

### C. Senate Bill No. 620

Defendant asks us to remand the case in light of Senate Bill No. 620 (SB 620), in order to permit the trial court to exercise its discretion whether to strike the firearm enhancement as to count 1 pursuant to amended section 12022.53, subdivision (h). The People concede that defendant is entitled to the requested remand. We agree that remand is appropriate because the record contains no clear indication of how the court might have acted had it been presented the opportunity to strike the firearm

23

enhancements imposed in this case. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

### D. Senate Bill No. 1437

There was substantial evidence at trial that Steven, not defendant, shot Eduardo. As indicated, the trial court's instructions permitted the jury to find defendant guilty of murder if he aided and abetted the commission of, or conspired to commit, murder or an assault with a firearm, the natural and probable consequence of which was murder.

In September 2018, about a year after defendant was sentenced and while his appeal was pending, the Governor signed Senate Bill No. 1437 (SB 1437), which went into effect on January 1, 2019. (Stats. 2018, ch. 1015.) SB 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) SB 1437 accomplished this through amendments to sections 188 and 189. (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)

Specifically, SB 1437 amended the definition of "malice" in section 188 to read: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); Stats. 2018, ch. 1015, § 2.) SB 1437 amended the statutory felony murder rule to provide that a participant in the perpetration or attempted perpetration of an enumerated felony resulting in death is liable for murder only if one of the following is proven: "(1) The person was the actual killer. [¶] (2) The person was not the

24

actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e); Stats. 2018, ch. 1015, § 3.)

SB 1437 also added section 1170.95, which allows defendants convicted of murder to seek retroactive relief if SB 1437's changes in the law would affect their previously sustained convictions. As relevant here, section 1170.95 provides that "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

Defendant presently argues that SB 1437's changes to sections 188 and 189 apply retroactively to his case, and that we should reverse his murder conviction because the jury could have convicted him on a theory of culpability—application of the natural and probable consequences doctrine— that no longer exists. Due to SB 1437, defendant claims the trial court

25

misinstructed the jury as to the elements of murder, and the jury did not make the factual findings necessary for a murder conviction.

Numerous decisions have held that relief under SB 1437 must be obtained via the statutory petitioning procedure set out in section 1170.95. (*People v. Bell* (2020) 48 Cal.App.5th 1, 10–11; *People v. Cervantes* (2020) 46 Cal.App.5th 213, 220–221; *People v. Garcia* (2020) 46 Cal.App.5th 123, 181–182; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1153–1158; *People v. Martinez* (2019) 31 Cal.App.5th 719, 724–730.) These cases have considered and rejected the same arguments defendant presently raises about why his murder conviction should be reversed under SB 1437 via direct appeal. (*Cervantes*, *supra*, at pp. 222–225; *Anthony*, *supra*, at pp. 1153–1154, 1156–1157; *Martinez*, *supra*, at pp. 725–728.) We agree with and adopt the reasoning in these opinions. Defendant has not persuaded us to reach a contrary conclusion.

Defendant relies on *People v. Ramos* (2016) 244 Cal.App.4th 99 to argue his murder convictions should be reversed on direct appeal, but we find that case clearly distinguishable. As defendant himself acknowledges, "in contrast to [SB] 1437, the legislation construed by *Ramos* did not include a superior court petition procedure." (*Ramos*, at pp. 102–103; see Stats. 2013, ch. 504, §§ 1–2 (AB 721).)

In sum, we reject defendant's request for relief under SB 1437 via direct appeal. Defendant can, if he chooses, pursue relief under SB 1437 through the petition procedure set out in section 1170.95.

## DISPOSITION

The case is remanded to the trial court to consider whether to strike the firearm enhancement imposed under section 12022.53. The clerk of the superior court is ordered to forward a certified copy of any amended abstract

26

of judgment to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

_____
Fujisaki, J.

WE CONCUR:

_____
Siggins, P. J.

_____
Jackson, J.

A152421

**People v. Joseph Angel Abbate**

(A152421)


Trial Court: Contra Costa County


Trial Judge: Hon. Charles B. Burch


Attorneys:

      Catherine White, under appointment by the First District Court of Appeal for Defendant and Appellant.

      Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Karen Z. Bovarnick, Deputy Attorney General for Plaintiff and Respondent.